IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ANTONIO J. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ANTONIO J. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

NOEMI J.M., APPELLANT.


Filed June 4, 2019.    No. A-18-722.


Appeal from the Separate Juvenile Court of Douglas County: ELIZABETH G. CRNKOVICH, Judge. Affirmed.

Kate E. Placzek, of Law Office of Kate E. Placzek, for appellant.

Donald W. Kleine, Douglas County Attorney, and Natalie Killion for appellee.


PIRTLE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Noemi J.M. appeals the order of the Douglas County Separate Juvenile Court terminating her parental rights to Antonio J., Graciela J., Zayda M., Arturo M., and Fernando M. She contends that the court erred in determining that certain statutory bases for termination under Neb. Rev. Stat. § 43-292 (Reissue 2016) were met, that termination of her parental rights was in the children's best interests, and that she was afforded due process despite not being allowed to testify. For the reasons discussed below, we affirm.

- 1 -

## II. STATEMENT OF FACTS

Although Noemi is the mother of seven children, only five of her children are involved in this appeal; her two oldest children are not part of this appeal and this opinion will not refer to them even though one or both may have been referred to by the juvenile court in its orders. The children involved in this appeal are Graciela, born in February 2002; Antonio, born in May 2004; Zayda, born in January 2013; Arturo, born in August 2015; and Fernando, born in February 2017. The fathers of the minor children are not part of this appeal and will only be referenced as necessary for the purposes of this opinion.

### 1. REMOVAL AND ADJUDICATION

In July 2015, the State filed a juvenile court petition alleging that Graciela, Antonio, and Zayda fell within the jurisdiction of the juvenile court due to Noemi's fault or habits because Noemi failed to provide proper parental care, support and/or supervision for the minor children and did not provide them with safe, stable, and/or appropriate housing. See Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014). The court granted the State's motion to remove Graciela, Antonio, and Zayda from Noemi's care that same day with placement to exclude Noemi's home. Graciela, Antonio, and Zayda were removed from the family home on July 23, 2015, and remained in foster care placements throughout the pendency of this case.

In August 2015, Noemi gave birth to Arturo. Arturo was immediately removed from Noemi's custody and placed in the custody of the Nebraska Department of Health and Human Services (DHHS). He has remained in foster care placement throughout the pendency of this case. The State amended the adjudication petition to add Arturo and also added the allegation that Noemi either knew or should have known that the father of one of the juveniles "had subjected a minor juvenile to inappropriate sexual contact."

In February 2016, Noemi admitted the counts of the amended adjudication petition alleging that she had failed to provide proper parental care, support and/or supervision and that, as a result, her children were at a risk for harm. The court determined that Graciela, Antonio, Zayda, and Arturo were children within the meaning of § 43-247(3)(a).

In July 2016, the court recommended that Noemi undergo a psychological evaluation. Because the State was appealing a ruling in the adjudication order, the court did not order a rehabilitation plan until December. The rehabilitation plan ordered by the court required Noemi to maintain employment and a legal source of income; maintain safe, stable, and suitable housing; participate in family therapy as deemed appropriate by the children's therapists until successfully discharged; participate in parenting training and/or classes; participate in individual therapy until successfully discharged; and participate in supervised visitation.

In February 2017, Noemi gave birth to Fernando who was immediately removed from her care. He has remained in foster care placement throughout the pendency of this case. The State filed a second supplemental adjudication petition adding Fernando and amending the allegations regarding Noemi to allege that Noemi's children lacked proper parental care by reason of her fault or habits because (1) the children had been removed from her custody and remained wards of the State; (2) Noemi was ordered to participate in numerous services to facilitate reunification with her children and her compliance and progress with said services prevented her from reunifying

with her children; (3) she failed to provide her children with proper parental care, support, and/or supervision; (4) she failed to provide her children with safe, stable, and appropriate housing; and (5) due to these allegations, the children were at risk for harm. In May, the juvenile court found that Fernando was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016).

## 2. TERMINATION OF PARENTAL RIGHTS

In November 2017, the State filed a motion to terminate Noemi's parental rights to Graciela, Antonio, Zayda, Arturo, and Fernando pursuant to § 43-292(2) and (6); sought termination of Noemi's parental rights to Antonio, Graciela, Zayda, and Arturo pursuant to § 43-292(7); and alleged that termination was in the minor children's best interests. The termination hearing was held over two days in March and April 2018. At trial, exhibits admitted into evidence included several DHHS case plans and court reports; a transcript of prior orders and filings in this case; and documentation of Noemi's conviction and sentencing for harboring two of her children. The State adduced evidence from three witnesses: Nicholas Chadwell, a family permanency specialist; Mary Ellen Christ-Anderson, Zayda's therapist; and Dr. Ryan Sewell, Fernando's otolaryngologist, or ear, nose and throat doctor (ENT). Noemi declined the court's offer to put on any evidence. The guardian ad litem (GAL) then called two witnesses: Dr. Jeremy Toffle, pediatrician, and Amanda Staley, the children's foster mother.

### (a) State's Evidence

#### (i) Nicholas Chadwell

Since August 2016, Chadwell has been assigned as the case worker for Noemi and the children. As a family permanency specialist, he helps families address the reasons that their children were removed and helps them achieve reunification by setting up services, conducting followthrough for services, and building case plans. Chadwell testified:

> My understanding of why the case came in is that the family had been participating in noncourt services since approximately 2012. They had a number of previous [Child Protective Services] investigations since 2011; most, if not all, substantiated agencywise -- or agency side. Progress with noncourt services was being met with resistance. There was a lack of follow-through. The home continued to remain dirty and unsanitary and unsafe. There were concerns with supervision. Two of the teenagers in the home were currently on probation and were delinquent at that time.

According to Chadwell, the court became involved in this case in July 2015. Chadwell testified that Noemi was ordered by the court to participate in the following services: maintain safe and stable housing, maintain a legal source of income, participate in individual and family therapy, participate in visits as arranged, and attend all medical appointments for her children.

According to Chadwell, Noemi participated in the following services: a parenting evaluation, completing a parenting class, completing an initial diagnostic interview, providing appropriate housing, attending family team meetings, maintaining employment, participating in visits, and participating in family therapy. Chadwell stated that Noemi's house was generally clean and he had only occasional concerns. These concerns occurred in mid-2017: one time he saw mice

in Noemi's home and one time he found beer bottles in the room of Noemi's oldest child who was over 18 and who was reported to be underage for drinking.

Chadwell testified that, although Noemi participated in family therapy, she was unsuccessfully discharged from individual therapy after less than two months. Noemi told Chadwell that she stopped individual therapy because she did not feel comfortable with the therapist and she felt the relationship or rapport between them was "very confrontational." Chadwell testified that the therapist was pursuing topics that Noemi did not want to address. Chadwell testified that he did not receive any documentation from the therapist indicating that Noemi had worked on the specific issues that brought her before the court and that this concerned him "[b]ecause the patterns of behavior that led to this issue being brought before the Court today cannot be adequately assessed as to whether they've been remedied or addressed in regards to the safety of the children returning home." Noemi began counseling with another therapist on a limited time basis while DHHS attempted to identify another appropriate therapist that fulfilled Noemi's request that she be provided with a bilingual therapist. This took time due to the limited number of bilingual therapists in Omaha.

Chadwell testified that Noemi reported that she had changed jobs in late summer or early fall 2017 which resulted in her hours becoming less flexible. Noemi reported that she would be reporting to work earlier in the morning, but would be able to get off work earlier and that "[s]he was changing her position so that she would be able to spend more time with her children and be available in the afternoons for any type of appointments or meetings." For the first few months of Noemi's new job, her lack of flexibility during the probationary period resulted in her being unable to attend appointments. However, after a few months, Noemi was able to, and did, start taking time off for appointments.

Chadwell testified that, as of the date of the termination hearing, Zayda, Arturo, and Fernando were all placed in the foster home of Amanda Staley, Antonio was placed in another foster home, and Graciela was missing from her placement. Noemi had been granted unsupervised visits in August 2017, but the visits were returned to supervised visits after "a month or less" after Noemi was found harboring Antonio and Graciela at her home. Noemi was incarcerated as a consequence of that event which caused her to miss visits with the children, one of Fernando's cardiology appointments, and the first day of the termination hearing. According to Chadwell, Noemi now has two visits each week with her younger children and two visits each week with Antonio. Chadwell stated that, in order for him to recommend that Noemi's visitations be liberalized, Noemi would need to be consistent with meeting all the children's appointments, whether educational, medical, or otherwise; she would need to make progress in individual therapy; maintain her current home; continue to use the parenting skills she learned in the 2017 parenting class; and follow-up on services.

Chadwell testified that 13-month-old Fernando has special needs due to health problems including Down syndrome, poor vision which required surgery, undescended testicles, and, more recently, a hole which was discovered in Fernando's heart. Fernando also suffers from significant physical and cognitive developmental delays. Due to his medical issues, multiple doctors and specialists work with Fernando including: Dr. Toffle, primary care physician; Dr. Sewell; Dr. Villanueva, urology and gastroenterology; unnamed cardiologist(s); unnamed occupational

therapist(s); physical therapists through Children's Hospital and Bellevue Schools; specialists associated with establishing a feeding program; a dietician; and specialists associated with establishing sleep evaluations. Chadwell testified that it is important that Fernando's caretakers

> communicate with the doctors in order to insure that Fernando continues to gain weight appropriately, to assess his ability to tolerate and take foods, whether they be oral fed or bottle-fed or otherwise, and to overall gauge his health, his diet, his nutrition, [and] his ability to thrive.

According to Chadwell, there were a series of feeding trainings related to Fernando and, initially Noemi attended the training, worked closely with the feeding team, and attempted to comply with the feeding team's recommendations. Chadwell testified that if Fernando is not fed properly, there is "a risk for aspiration, choking, [and] fluid to the lungs. He could suffocate and die or be malnourished."

Chadwell testified that Noemi has not consistently attended or participated in the medical and educational appointments for her children. Further, he testified that Noemi struggled to follow through with doctor's instructions for Fernando's medical care although she has made improvements in that area. Additionally, he noted that Noemi has been aware since November 2017 that she needed to schedule an Individualized Education Plan meeting for Antonio and that it was her responsibility to schedule the meeting. Despite this, Noemi had not scheduled the IEP meeting as of the termination hearing.

In determining whether or not termination of parental rights is in a child's best interests, Chadwell testified that he considers factors including the length of time the children have been in out-of-home placement or State wards; the progress, or lack thereof, parents are making on achieving court orders or case plan goals; whether there are any immediate safety threats in the home; relapse; and parents' lack of participation in services. At the time of the termination hearing, Zayda had been placed with Staley for "approximately two years . . . or more" and Fernando and Arturo had been placed with Staley for their entire lives. Graciela had run away from her placement and had been missing for nearly two months. Chadwell testified that, in his opinion, it was in the minor children's best interests for Noemi's parental rights to be terminated. He based his opinion on the lack of overall progress in addressing the original reasons the children were removed; the lack of follow-through with school and medical appointments; the lack of ability in addressing the gang involvement and juvenile delinquent behaviors for the oldest children; the lack of emotional attachment with at least one of the children; and the overall time the children have been in foster care. When asked if it really is in Graciela's best interests to terminate Noemi's parental rights, Chadwell stated: "I think Graciela's choice of going missing from her placement doesn't exclude the other reasons that brought us here today."

*(ii) Mary Ellen Christ-Anderson*

Mary Ellen Christ-Anderson is a licensed children's mental health counselor and served as 5-year-old Zayda's therapist since October 2015. Christ-Anderson testified that Zayda exhibited abnormal sexual behaviors including playing with the family dog's genitals and attempting to inappropriately touch her younger brother during diaper changes. Zayda also exhibited poor social

skills, poor listening skills, poor boundaries, had difficulty falling and staying asleep, and had night terrors. Christ-Anderson identified goals for Zayda's therapy including decreasing sexualized behaviors; increasing social skills such as eye contact, verbalizing, listening, and answering people; addressing sleep issues; teaching Zayda to respect boundaries; and decreasing controlling behaviors. Christ-Anderson observed improvement in all of these areas which she attributed to good therapy, excellent foster parents, support of CASA workers, good school services, and involvement in extracurricular activities.

Christ-Anderson testified that she had "at least 12" family therapy sessions with Zayda and Noemi. Often, Christ-Anderson would be in the lobby when Zayda came in and would observe Zayda run past Noemi to play and "not say hello or acknowledge [Noemi] really in any way." Sometimes Christ-Anderson or the foster mother would intervene and tell Zayda to say hello to Noemi. There were also times when Zayda would not want to separate from her foster mother for therapy and Christ-Anderson particularly noted that Zayda had difficulty going back into her office on days that Noemi was present for therapy. During family therapy, Zayda wanted to play by herself and did not engage with Noemi; however, this improved toward the end of therapy where Zayda would "occasionally" play with Noemi.

Christ-Anderson testified that Zayda does not exhibit healthy attachments to Noemi. Although Christ-Anderson worked with Noemi on being warmer, gentler, and kinder with Zayda, Noemi failed to implement changes long-term. For example, during one of the last family therapy sessions, Noemi threatened to withhold a birthday party "for a minor infraction." Christ-Anderson explained that Noemi had "a very heavy hand with her, and that's not the approach that works with Zayda."

Christ-Anderson testified that, after unsupervised visits started between Zayda and Noemi, Zayda "appeared to have symptoms of anxiety" including severe stuttering, hyperactivity, and increased sleep disturbances. Christ-Anderson testified that, since September 2017, Zayda has stated that she does not want to see Noemi or go to her house.

Christ-Anderson testified that permanency for children is "crucial"

[b]ecause children need loving and caring adults that keep them safe and nurture them and help them to develop to productive, capable human beings. And in order to do that, they need a strong, healthy foundation. And a permanent, loving home provides that basis in which to navigate the world.

Christ-Anderson testified that, based upon her work with Zayda, her involvement in the case, collateral information, and her clinical observations, her opinion within a reasonable degree of therapeutic certainty, is that termination of Noemi's parental rights was in Zayda's best interests.

### (iii) Dr. Ryan Sewell

Dr. Sewell has served as Fernando's doctor since February 2017. Sewell diagnosed Fernando with severe obstructive sleep apnea for which he performed surgery on Fernando's airway. Sewell testified Fernando's medical history includes Down syndrome which often leads to lifelong ENT concerns. Additionally, about 90 percent of children with Down syndrome that have ear tubes will need to have them replaced, problems with tonsils and adenoids are very

common, and 90 to 100 percent of children will develop trouble with obstructive sleep apnea. Because aspiration, or swallowing into the airway, has been a problem for Fernando, Sewell explained that Fernando's caregivers need to learn how to properly feed Fernando either orally or through a tube so that the risks of aspiration are minimized. Sewell testified that Fernando will probably need ENT care for "a long time."

*(iv) Additional Evidence Relating to Graciela*

Graciela was diagnosed with depression in November 2015 and she is also affected by alcohol use disorder and cannabis use disorder. Court reports indicated that Graciela was resentful to Noemi for past abuse and for Noemi's refusal to believe Graciela's report that Noemi's boyfriend had molested her. Graciela refused visits with Noemi in early 2016.

Graciela struggled with being separated from her siblings and agreed to visitations in March 2016 if her siblings would also be present. The February 2017 court report stated that Graciela reported "some resentment" toward Noemi but was glad to see her and believed they would become closer. A court report prepared in July 2017 stated that visits were going very well for Graciela; that she was very happy to be with her siblings; and would laugh with, watch movies with, and was bonding well with Noemi.

*(v) Additional Evidence Relating to Antonio*

At the time of the termination hearing, Antonio was 13 years old. He has had truancy and behavior issues in school since he was 11 years old. Although Antonio reported a strong allegiance to Noemi and his siblings, and claimed he wanted to live with Noemi, the September 2016 court report stated that when asked what he would need to feel safe living with Noemi, Antonio became quiet. The July 2017 court report stated that, while Antonio claimed to want to live with Noemi, he has acted out when offered more visits.

According to a February 2017 court report, Antonio claimed to be a gang member and, although his actual gang involvement is unclear, he was assigned a gang prevention mentor. Although Antonio got along with this mentor, he did not see him as a mentor nor did he understand the mentor's role. Before running away to Noemi's residence in September 2017, there was a period of time when Antonio would sneak out of his foster home at night to meet individuals who were part of his "gang." Additionally, Antonio idolizes his older brother who has been an active gang member.

*(vi) Incident Involving Harboring Children*

In August 2017, the court granted Noemi unsupervised visitation with her children. In mid-September, less than 1 month after the court ordered unsupervised visits, Graciela and Antonio left their placements without permission. Their whereabouts were unknown until police officers located them hiding in Noemi's basement several weeks later. After being found, Antonio was placed in a new foster home. His new foster mother noted no significant problems and reported that Antonio was polite, respectful, and followed house rules. Two months before the termination hearing, Graciela had run away from her placement and her whereabouts were still unknown. As a consequence of harboring her children, Noemi was charged and convicted of two counts of

harboring a child and one count of obstructing the administration of the law. At the end of September 2017, Noemi's unsupervised visits were suspended.

As late as July 2017, before unsupervised visits began, Zayda reported that she was enjoying visits and that her relationship with Noemi was improving. However, once unsupervised visits started, Zayda would sometimes hide to avoid going to visit Noemi. When asked why she did not want to visit Noemi, Zayda simply said "Momma Noemi is mean."

### (b) GAL's Evidence

Following the conclusion of the testimony by the State's witnesses, the court asked Noemi's counsel if she was presenting any evidence, to which she responded "No, Your Honor." The court then asked if the GAL was presenting evidence and the GAL responded in the affirmative. The GAL then adduced testimony from witnesses Dr. Toffle and Stoley.

### *(i) Dr. Jeremy Toffle*

Pediatrician Dr. Toffle testified that he has been Fernando and Aturo's doctor for their entire lives and he has been Zayda's doctor from the time she was placed in foster care with Staley. Toffle reported that Zayda and Arturo were generally healthy. Further, Toffle testified more specifically regarding Fernando's health and treatment. Toffle testified that Fernando has Down syndrome and a history of the following: obstructive sleep apnea, reflux, and constipation for which he takes daily medication.

Toffle testified that Fernando is unable to tolerate a certain consistency of liquids so his feeding is managed mainly through a "G-tube" which is a tube that connects through the skin into the stomach. Toffle testified that sometimes when Fernando swallows liquids, he will aspirate, which means the liquids will go down into Fernando's lungs which causes complications. Toffle testified that Fernando's caregivers will "need to obviously attend every visit to make sure they know what the feeding plans are, to know what may be a plan of action if something weren't to go right." He also testified that Fernanco's caregivers need to know how to prepare the nutrition, how to use the pump, how to connect it to Fernando's tube, and how to clean it, and that the risks of improper feeding include malnutrition and aspiration. Toffle also testified that feedback on how feedings are going at home is important to the feeding team.

### *(ii) Amanda Staley*

Staley is Fernando, Arturo, and Zayda's foster parent. Staley testified that Fernando has about eight medical appointments per month and that Noemi has only attended about 10 percent of Fernando's total appointments.

### (c) Due Process Regarding Noemi's Right to Testify

After the conclusion of the GAL's evidence, the court asked the State if it was submitting on the evidence or wished to make an argument and the State indicated it would submit on the evidence. When Noemi's attorney was asked if she would like to submit, she requested a recess to speak with Noemi. The following colloquy ensued after the recess:

> THE COURT: Yes, Counsel.
>
> [Noemi's counsel]: My client would like to testify.

THE COURT: Well, you rested.

[Noemi's counsel]: On rebuttal to the --

THE COURT: Well, I do not know how to proceed because all the parties rested, and I was asking solely for whether you are submitting of whether you are -- have argument to make.

[Noemi's counsel]: Am I not allowed to rebut the two that present --

THE COURT: Generally the time to present evidence is before the court says, are you submitting on the evidence. Because I -- as I recall, the State gave their evidence and I asked both counsel, are you presenting evidence, and both counsel said no. And then the guardian ad litem presented their (sic) evidence.

[Noemi's counsel]: Then we'll rest, your honor, and just submit and argue.

Noemi's counsel did not formally make an objection following this colloquy or make an offer of proof. The parties made arguments to the court and the matter was taken under advisement by the court.

### 3. JUVENILE COURT ORDER

In June 2018, the juvenile court entered an order terminating Noemi's parental rights pursuant to § 43-292(2), (6), and (7) and finding that termination of Noemi's parental rights was in the minor children's best interests. Noemi has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Noemi assigns as error that the juvenile court erred in determining that the statutory bases for termination under § 43-292(2), (6), and (7) were met and that termination was in the minor children's best interests. She also claims that the juvenile court violated her constitutional due process rights by denying her request to testify.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of K.M.*, 299 Neb. 636, 910 N.W.2d 82 (2018). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

Noemi contends that the juvenile court erred in terminating her parental rights pursuant to § 43-292(2), (6), and (7).

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). The State sought to terminate Noemi's parental rights to Graciela, Antonio, Zayda, and Arturo pursuant to several statutory subsections of § 43-292 including subsection (7).

Under § 43-292(7), a juvenile court may terminate parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The Nebraska Supreme Court has held that § 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

Graciela, Antonio, and Zayda were all removed from the family home on July 23, 2015, and have remained in foster care placements throughout the pendency of this case until the termination hearing which took place in March and April 2018. Arturo was removed from Noemi's care and placed in foster care placement immediately after his birth in August 2015. Accordingly, Graciela, Antonio, Zayda, and Arturo, have each been in out of home placement for over 2½ years which exceeds the 15-month requirement. Having found that there is clear and convincing evidence to show that Graciela, Antonio, Zayda, and Arturo had been in an out-of-home placement for over 15 of the past 22 months under § 43-292(7), we need not discuss the other statutory grounds which the court found to exist. See *In re Interest of Jade H. et al.*, 25 Neb. App. 678, 911 N.W.2d 276 (2018) (only one statutory ground for termination need be proved in order for parental rights to be terminated).

The State sought to terminate Noemi's parental rights to Fernando pursuant to § 43-292(2) and (6) and the court terminated her parental rights to Fernando pursuant to those subsections. Subsection 43-292(2) requires proof that "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis, but common factual patterns include parental incarceration, adjudication, involuntary termination, or relinquishment of previous children, unsanitary house and unkempt children, or addiction to drugs or alcohol. See *In re Interest of Elijah P. et al.,* 24 Neb. App. 521, 891 N.W.2d 330 (2017). Further, a parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

Regarding Fernando, the State adduced evidence that Noemi gave birth to Fernando in February 2017. Fernando was immediately removed from her care and remained in foster care placement his entire life. Fernando has numerous medical issues including Down syndrome, poor vision, heart problems, obstructive sleep apnea, reflux, constipation, serious feeding issues, and physical and cognitive developmental delays. Fernando's foster mother testified that Noemi attends only about 10 percent of Fernando's eight medical appointments per month. One of Fernando's doctors testified that Fernando's caregivers will "obviously [need to] attend every visit to make sure they know what the feeding plans are, to know what may be a plan of action if something weren't to go right." The caregivers need to know how to prepare the nutrition, how to use the pump, how to connect it to Fernando's tube, and how to clean it. Risks of improper feeding include malnutrition and aspiration. Fernando's ENT doctor explained that Down syndrome often leads to lifelong ENT concerns and that Fernando will probably need ENT care for "a long time." Finally, Chadwell testified that Noemi has not consistently attended or participated in the medical

and educational appointments for her children and that Noemi struggled to follow through with doctor's instructions for Fernando's medical care although she has made improvements in that area. By virtue of these failures, Noemi has repeatedly neglected and refused to provide necessary care and protection for Fernando. The State proved, by clear and convincing evidence that termination of Noemi's parental rights to Fernando was proper under § 43-292(2). Only one statutory ground for termination need be proved in order for parental rights to be terminated. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). We therefore need not consider whether § 43-292(6) was also proved regarding Fernando.

### 2. BEST INTERESTS

Noemi next assigns that the juvenile court erred in finding that termination of her parental rights was in the minor children's best interests.

A finding that termination of parental rights is in the best interest of the child must be made by clear and convincing evidence. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Courts presume that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Kendra M. et al., supra*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State proves that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id*.

Here, the evidence established that all five children involved in this case have been in foster care for an extended period of time. Graciela, Antonio, and Zayda have been in foster care since July 2015. Arturo and Fernando have been in foster care since their births in August 2015 and February 2017 respectively. Further, although the court became involved in this case in July 2015, Noemi had been participating in noncourt services since 2012 with little progress.

Noemi has also demonstrated poor supervision, care, and decision-making regarding her children and a lack of respect for court orders. She refused to believe Graciela's report that Noemi's boyfriend had molested her. Shortly after Noemi was granted unsupervised visitation, both Graciela and Antonio left their foster homes without permission and were found two weeks later hiding at Noemi's home. As a result of this incident, Noemi was convicted of two counts of harboring a child and one count of obstructing the administration of the law.

One month of unsupervised visitation with Noemi resulted in startling negative impacts on Zayda. After starting unsupervised visits, Zayda' behaviors regressed dramatically: Zayda began stuttering, was hyperkinetic and moved around a lot, had more sleep disturbances, and hid when it was time to go to visits. After Noemi was granted unsupervised visits, Zayda told Christ-Anderson that she did not want to go to Noemi's house or see Noemi. When asked why she did not want to go on visits, she simply stated "Momma Noemi is mean."

Likewise, neither Zayda nor Arturo had strong attachments to Noemi. Zayda has demonstrated little to no attachment or bond to Noemi even after having visits and at least twelve sessions of family therapy with Noemi. Christ-Anderson testified that, during the most recent family therapy sessions, Zayda started asking Noemi to play "occasionally," but would still turn to Christ-Anderson for help or to play with her. Arturo has developed a strong bond with his foster

- 11 -

mother as a baby and has developed a very close bond with Zayda who was placed with the same foster mother. Antonio, although stating that he wanted to live with Noemi, would become quiet when asked what he would need to feel safe living with Noemi and acted out more frequently when he was offered more visits with Noemi. Noemi also failed to schedule an IEP meeting for Antonio despite being aware of its need since November 2017. Graciela had expressed resentment toward Noemi for past abuse and failing to believe her report that Noemi's boyfriend had molested her. Fernando has never lived with Noemi and has always been in foster care. Noemi has inconsistently attended Fernando's weekly medical appointments and she has struggled to follow through with doctors' instructions for Fernando's medical care.

Further, Christ-Anderson testified that permanency for children is "crucial"

[b]ecause children need loving and caring adults that keep them safe and nurture them and help them to develop to productive, capable human beings. And in order to do that, they need a strong, healthy foundation. And a permanent, loving home provides that basis in which to navigate the world.

Here, in the more than two years that this case has been ongoing, Noemi has been unable to put herself in a position to parent her children despite the numerous services provided to her. At the time of trial, she had again regressed to supervised visitation with her children. In addition to the documented issues governing each one of her children, Noemi failed to complete individual therapy and, according to Chadwell, after more than two years, Noemi has not made adequate overall progress in addressing the original reasons the children were removed. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Based upon our de novo review, we find that the evidence establishes that Noemi is unfit to parent her minor children and that the juvenile court correctly determined that the State established by clear and convincing evidence that termination of Noemi's parental rights was in the minor children's best interests.

### (3) DUE PROCESS

Noemi contends that the juvenile court violated her constitutional due process rights by denying her request to testify.

Here, after the State concluded its case-in-chief, Noemi was offered the chance to present evidence but declined to do so. The guardian ad litem then adduced evidence from Toffle and Staley. These witnesses' testimony was largely cumulative of the evidence previously presented by the State. Toffle mainly testified to Fernando's feeding issues. Dr. Sewell, who testified for the State, also testified regarding Fernando's feeding issues. Staley mainly testified regarding Noemi's lack of attendance at medical appointments. Chadwell also testified regarding this issue.

Noemi, having declined to present evidence following the close of the State's case-in-chief, now claims that her due process rights were violated after not being allowed to testify after the GAL presented its evidence which was essentially cumulative of evidence presented by the State and which Noemi opted not to rebut. Noemi asked if she could offer evidence following the GAL's testimony, however, following her colloquy with the court, agreed to rest and just submit and

argue. Noemi did not object on due process grounds as she does now on appeal, nor did she supply the court with an offer of proof of what Noemi would have said had she been allowed to testify.

A constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal. *Shepherd v. Chambers*, 281 Neb. 57, 794 N.W.2d 678 (2011). Because Noemi failed to raise the due process issue before the trial court, this issue is not properly before this court.

Having made this determination, we note that the procedure used by the juvenile court in this case, i.e., adducing evidence by the State, then the parent, then the GAL without allowing the parent to then rebut the GAL's testimony, placed the parent and the parent's counsel in a position in which the parent could not respond to the evidence adduced by the GAL. Although we have held that in this case the GAL's evidence was basically cumulative of a portion of the State's evidence which Noemi opted not to rebut and that Noemi's counsel failed to preserve the due process argument, we are not holding that the process followed here was appropriate procedure and, in fact, caution against such a practice.

## VI. CONCLUSION

Based upon our de novo review, we concluded that the juvenile court did not err in terminating Noemi's parental rights to Graciela, Antonio, Zayda, and Arturo pursuant to § 43-292(7) and the termination of her parental rights to Fernando pursuant to § 43-292(2), and in finding that termination was in the minor children's best interests. We further find that Noemi failed to properly preserve her claim that the juvenile court violated her constitutional due process rights by denying her request to testify. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.